FILED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

97 JUN 27 PM 3: 35

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| **SANOYIA WILLIAMS**, | ] |
| | ] |
| Plaintiff(s), | ] |
| | ] |
| vs. | ] CV-96-N-2378-NE |
| | ] |
| **ALABAMA AGRICULTURAL AND** | ] |
| **MECHANICAL UNIVERSITY;** | ] |
| **OSCAR MONTGOMERY,** | ] |
| **individually and as Vice** | ] |
| **President for Student Affairs;** | ] |
| **and MARY MORRIS-BILLINGS,** | ] |
| **individually and as Director** | ] |
| **of Counseling and** | ] |
| **Development**, | ] |
| | ] |
| Defendant(s). | ] |

ENTERED

JUN 27 1997

## **Memorandum of Opinion**

### I.   **Introduction.**

In this employment discrimination action, the plaintiff, Sanoyia Williams ("Williams"),

originally brought claims against the defendants, Alabama Agricultural and Mechanical

University (the "University"), Oscar Montgomery in his individual and official capacities

("Montgomery"), and Mary Morris-Billings in her individual and official capacities

("Morris-Billings"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et*

*seq.* ("Title VII"),[1] 42 U.S.C. § 1983 ("Section 1983), the Equal Pay Act of 1963, 29 U.S.C.

§§ 201 and 206 (the "EPA"), and the Constitution of the State of Alabama.  Specifically, her

complaint avers that the defendants discriminated against her on the basis of sex when it

---

[1] The Title VII claim is brought solely against the University. *Complaint* at 6.

34

failed to compensate her for the work she did as Counselor/Coordinator for the University's Office of Counseling and Development. *Complaint* at 3, 6. She further alleges that the University violated her right to procedural due process when it filled a vacancy and violated the Equal Pay Act and her right to substantive due process when it failed to pay her wages equivalent to that received by her male counterparts. *Id.* at 4-6.

In an order entered on November 14, 1996, the court dismissed the plaintiff's claims for monetary damages against Montgomery and Morris-Billings in their individual and official capacities for violation of her state and federal procedural and substantive due process rights, and totally dismissed the Equal Pay Act claim against them. The court also dismissed the plaintiff's claims for injunctive relief against Montgomery and Morris-Billings in their individual capacities for violation of her federal procedural and substantive due process rights.

This matter is presently before the court on the defendants' motion for summary judgment, filed on April 15, 1997. The motion has been fully briefed and was submitted at the court's June 27, 1997, motion docket. Upon due consideration, the motion will be granted in part and denied in part.

## II.   Statement of Facts.[2]

The University for many years operated a facility wherein various counseling services were provided to students. In 1987, the University renamed the office as the Office

---

[2] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

of Counseling and Development ("OCD") and placed it under the control of the University's Office of Student Affairs. The OCD was funded through a five-year grant obtained by the University from the United States Department of Education. The University submitted a grant application in 1987 written by Dr. John Vickers providing for one personal-social counselor and one financial aid counselor. The application proposed an estimated salary of $22,000 for the personal-social counselor position and $23,000 for the financial aid counselor position. These estimates were intended to be approximations of the salaries actually offered to those individuals filling the positions but in no way controlled the eventual offer of employment. Individuals employed under this grant, as with any other grant, were University employees, and their salaries had to comply with the University's salary guidelines. Once a grant was funded, the University's Department of Human Resources classified the new positions and established correct starting salaries for each according to the salary schedule. If, after classification by Human Resources, it was found that a position's salary was inadequate, funding was borrowed from another line item within the grant. Funding for the financial aid counselor was not to begin until the 1988-89 fiscal year.

The Department of Education subsequently awarded the University the grant, and Jimmy Downing ("Downing") transferred into the personal-social counselor position in February 1988. Downing holds a master's degree. Downing's original duties included: (1) assisting with the planning, development, and implementation of counseling, crisis intervention, and study skills programs; (2) working closely with all dormitory directors, other Student Affairs and academic personnel to insure effectiveness of the total counseling

3

program; (3) serving as immediate supervisor of graduate students and peer counselors;
(4) conducting individual and group counseling sessions; (5) maintaining accurate student
records; (6) conducting workshops for students and peer counselors; and (7) coordinating
all services provided by the University under its veteran's affairs program. At the time
Downing accepted his new position, he had been employed with the University since July
1981. His annual starting salary as counselor was $24,000.

Later in 1988, the University instituted a salary schedule for staff employees that had
been designed by an outside consultant. Pursuant to the new schedule, all staff positions
were classified with a grade, and each person was placed on a "step" within that grade
based upon their length of service and without regard to sex, race, age, or any other such
factor. Annual salary is thus based upon step and grade. Downing's position was
classified under the new schedule as a grade XV, and due to his length of service, he was
assigned to step 5 within that grade.[3] In January 1989, his salary rose to $25,440 along with
that of all other employees of like step and grade. The University subsequently determined
that Downing should have been classified as a grade XV, step 9; therefore, in October 1989,
Downing's salary was raised to $27,040. In November 1990, the University granted all its
employees a three percent salary increase, and, as a result, Downing's salary rose to
$27,851.

---

[3] The plaintiff stated in her responsive submission that she has insufficient knowledge at this time with
which to admit or dispute this fact proposed by the defendants. *Opponent's Responsive Submission* at vi.
Discovery closed in this matter on April 15, 1997. Thus, the plaintiff will not gain any further knowledge with which
to admit or dispute this fact. The defendants, on the other hand, have offered evidence in support of this fact.
*See Defendants' Exhibit B* at ¶ 5. The court will consequently consider this proposed fact and all others for which
the defendant has offered supporting evidence and to which the plaintiff responded in a similar fashion to be
admitted for purposes of the motion for summary judgment.

4

The plaintiff, like Downing, holds a master's degree. The University hired the plaintiff in October 1990 as a part-time employee working in a capacity unrelated to personal-social counseling. Williams initially earned $7.15 per hour. The University applied for another grant and obtained funding for a second personal-social counselor position in the OCD. The application was established prior to consideration of any employment for the position and was unrelated in any way to the gender of the person who would eventually fill the position. In January 1991, Williams applied for and was offered the second personal-social counselor position. Her job description defined her duties as including: (1) assisting with the planning, development, and implementation of counseling, crisis intervention, and study skills programs; (2) working closely with all dormitory directors, other Student Affairs and academic personnel to insure effectiveness of the total counseling program; (3) serving as immediate supervisor of graduate students and peer counselors; (4) conducting individual and group counseling sessions; (5) maintaining accurate student records; and (6) conducting workshops for students and peer counselors. At the time Williams joined the OCD, Downing had been serving as a counselor in that department for approximately three years. Williams was initially classified as a grade XV, step 1 and thus received a salary of $22,644. Prior to accepting the position, the plaintiff was advised of the salary she would earn and did not object. Downing's salary at that time was $27,851.

The grant under which the OCD operated contemplated that the University would hire at its own expense a director for the OCD. In 1991, the University's Board of Trustees declared a state of financial exigency as a result of severe cuts in state funding. The State

5

of Alabama, because of its own income shortfalls, reduced the funding that had previously been awarded to the University for expenditure during the fiscal year. This reduction precipitated decreased University operations. For a subsequent period of time, the University left vacant positions unfilled, withheld salary and compensation increases, and shortened its work week, all in an effort to conserve resources. Due to this declared state of financial exigency, the University was unable to fund the Director position for several years. During the interim, Oscar Montgomery, Vice President for Student Affairs, served as Director of the OCD.

In August 1991, the University redefined Downing's and Williams' job duties and delineated specific areas of responsibility for each individual. The positions of personal-social counselors with coextensive responsibilities ceased to exist, and the University created two new positions with different areas of responsibility and function.[4] The University changed Downing's title to Coordinator, Student Development Programs, while it changed Williams' title to Coordinator, Counseling and Student Development. Neither Williams nor Downing received a salary adjustment as a consequence. In addition to Downing's duties as counselor, he was assigned duties relating to the administration of the University's veterans' program but received no additional compensation for the assumption of those duties. The duties divided between Downing and Williams were all duties that had been assigned for performance by the two counselors within the OCD since the center's

---

[4] The new positions both had student counseling responsibilities, however.

6

inception. The duties were reassigned so that there would be no question as to who was responsible for the various areas of operation within the OCD.[5]

In 1993, Williams assumed responsibility for the University's Access to Learning Program dealing with student services related to Section 504 of the Rehabilitation Act of 1976 and the Americans with Disabilities Act. For the assumption of these duties, the University increased Williams' salary by $5,000 annually. Since receiving the $5,000 increase, all other pay raises Williams received were the result of cost of living increases provided to all University employees.

Downing terminated his employment with the University in 1996. During his tenure as an employee in the OCD, he received salary increases only as a result of salary schedule adjustments or cost of living increases that all other University employees also received. His salary during the last year of his employment was $30,733, while Williams' salary at that time was $29,748.

James Garner ("Garner") has been employed by the University since 1968 and currently serves as the University's Dean of Students, responsible for the administration and coordination of all programs and services of students. Garner's specific responsibilities include: (1) providing leadership and direction to the development and execution of University policies pertaining to student life and welfare; (2) serving as chief officer for

___

[5] The court cannot determine whether Williams was assigned duties for which she was not previously responsible. The defendants assert that she was assigned only those duties for which she was already at least partially responsible, *Defendants' Revised Initial Submission* at xi, and cite evidence to support their assertion. *See Defendants' Exhibit C* at ¶ 8. The plaintiff admitted this fact in her response. *Opponent's Responsive Submission* at vii. In the plaintiff's statement of additional claimed undisputed facts, however, Williams contradicts herself and asserts that she assumed additional duties. *Id.* at xi.

7

students in matters of counseling and discipline; (3) coordinating freshman orientation activities; (4) coordinating homecoming activities; (5) serving as advisor to the undergraduate Alumni Normalite Association; (6) planning and managing student life budget; and (7) advising other divisions of the University on matters of policy pertaining to student life and welfare. Garner earns a salary of $43,260. Before he was named Dean of Students, he served as Coordinator, International Student Services and earned a salary of $34,272. Prior to serving in that capacity, he held the position of Director of Housing, responsible for all aspects of University housing, including the oversight and assignment of students to the dormitories, hiring and supervision of dorm staff, building repair and maintenance, all student disciplinary matters, as well as numerous other duties. He transferred from that position to the one as Coordinator, International Student Services on the advise of his physician. As a result of Garner's length of service with the University as well as the circumstances surrounding the transfer, his salary as Coordinator was not decreased from the salary he earned as Director of Housing. In that capacity, Garner was classified as a grade XVI, step 10.

The University has no policy that requires the award of any additional compensation when an employee is asked to perform additional or different duties or responsibilities. Such awards are made only in exceptional circumstances or if non-University funding is available from which to make such an award. While serving as Director of Housing, Garner filed a grievance with the University, seeking an award of $3,000 for additional duties he had performed over an extended period of time that had previously been performed by other employees. He claimed that the University had specifically promised him that he

8

would receive additional compensation in return for assuming the additional responsibilities. He eventually received a one time merit award in the amount of $3,000 because he, as Director of Housing, had assumed the majority of the duties of two other individuals, Betty Knowles, Dean of Women, and Charles Rice, Dean of Students, who left their positions and were not replaced due to funding constraints.[8] Garner received no increase in salary for the assumption of these additional duties.

William Thigpen ("Thigpen") was initially employed by the University as a residential advisor in 1984. In that capacity, he was responsible for the supervision of all students residing in the dormitory, the implementation and monitoring of Student Life Programs, the guidance and counseling of students, and the general upkeep and maintenance of the assigned building. He earned a salary of $15,882. He was appointed Interim Director of Housing in April 1992 and remains in that capacity presently. Thigpen is responsible for the housing of approximately 3,000 students in the University's dormitories and living/learning centers, and he receives a salary of $36,022.23.

Michael Radden ("Radden") has been employed by the University since August 1, 1996, as Coordinator, Student Development Program. His initial salary was $25,226

___
[8] The plaintiff disputes this fact, citing paragraph 13 of her affidavit as support for the dispute. *Opponent's Amendment to Responsive Submission* at 1. Rule 801 of the Federal Rules of Evidence defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 802 of the Federal Rules of Evidence provides that hearsay is generally not admissible. Paragraph 13 of the plaintiff's affidavit contains information regarding Garner's employment. Williams states in the affidavit that she has personal knowledge of the information contained therein. *Plaintiff's Affidavit* at ¶ 1. She testified under oath, however, that she acquired such knowledge through documents provided her by Garner. *Plaintiff's Deposition* at 77-79. It therefore appears to the court that Williams does not have personal knowledge of the matters contained within paragraph 13 of her affidavit. Paragraph 13 is therefore hearsay and, as such, is inadmissible; consequently, the court will ignore the information contained therein for purposes of the motion for summary judgment.

9

annually. His job duties include: (1) rendering direct personal-social counseling; (2) coordinating and implementing study skills programs; (3) operating and maintaining established Living-Learning Centers as assigned, including but not limited to ensuring computers are functioning and monitoring twenty student workers; (4) coordinating veterans' affairs services and programs and monitoring six student workers; (5) maintaining client files for each student seen for veteran affairs and personal-social counseling; and (6) providing crisis intervention for students engaged in any type of at-risk behavior. The University approved a three percent cost of living adjustment for the salaries of all employees during the 1996-97 fiscal year; therefore, Radden's current salary is $25,982. Williams' current salary as Counselor/Coordinator, Access to Learning is $30,640.

In April 1994, the University announced an opening for the position of Director of the OCD. University procedures, as set out in the University Faculty/Administrative Staff Handbook, dictate that a search committee be appointed to screen and evaluate potential candidates when filling vacancies for Dean, Department Chairperson, Program Director and certain other categories of faculty. The committee recommends finalists to the administrator responsible for making the final selection but has no authority to select an individual to fill a particular vacancy. Typically, the committee recommends three top candidates. The administrator then selects from the recommended candidates or, if none of them meets with his approval, he can direct the committee to reopen the search. In this instance, Montgomery was the administrator responsible for making the final selection for Director of Counseling. No search committee was appointed, however. Rather, the Department of Human Resources initially screened the applications and forwarded to

10

Montgomery all that met the position's requirements. Montgomery then selected from those applications four top candidates and scheduled interviews with each.

Williams applied for the position, was designated as qualified by the Department of Human Resources, and was selected by Montgomery as one of the top four candidates. Montgomery interviewed the plaintiff prior to making any decision as to who would fill the position and gave Williams full consideration. He explained the process by which he would select a Director of Counseling, and at that time, Williams did not complain or raise any question with regard to the absence of a search committee. She first made such a complaint after learning that she had not been selected. Instead, Montgomery selected Mavis Bailey ("Bailey") because he believed her credentials and experience far exceeded those of the other applicants. At the time, Bailey broadcast a radio talk show in which she addressed various counseling-related issues. When Williams interviewed for the position, she was not a licensed counselor nor was she licensable.[7]

The University's Faculty/Administrative Staff Handbook sets out that it "provide[s] faculty and administrative staff with pertinent information and guidance relative to the University, its mission, goals, organization, policies and operational procedures." *Defendants' Exhibit B-1* at 1. The Handbook "is not intended to constitute or be part of an employment contract between the employee and the University, nor is anything contained in [it] a covenant and should not be construed as such." *Id.*

---

[7] A counselor, though not licensed, is considered licensable if he or she has completed a certain number of required clinical hours and is working toward the completion of the hours necessary to obtain a license.

11

Williams filed an internal grievance with the University in September 1994, contesting the procedure that had been utilized to fill the vacant position of Director of Counseling and complaining that she had been paid less than similarly situated males. The grievance was heard by a committee and ultimately decided by the Vice President for Academic Affairs in accordance with the University's internal procedures.[8] The committee determined that Williams had received unfair treatment as a candidate for the position of Director of Counseling due to the fact that a search committee was not formed and utilized. The grievance committee made a final determination on that issue, however, to deny any relief sought by Williams on the express finding that, although a search committee had not been utilized, fair and adequate procedures had been followed and the selection made by the appropriate official. On the salary issue, the committee found that Williams had received additional duties for the period of October 1, 1992, through August 1, 1994, for which she had not been compensated and concluded that Williams' salary was lower than her male counterparts.[9] It recommended that the plaintiff be awarded $500 per month for

---

[8] The plaintiff disputes this fact, citing Plaintiff's Exhibit B at 31-32 as support for the dispute. Rule 901 of the Federal Rules of Evidence provides that authentication is a condition precedent to admissibility of evidence. Plaintiff's Exhibit B is a compilation of photocopied documents, such as her charge of discrimination filed with the Equal Employment Opportunity Commission, University personnel records, and copies of the grievance she filed with the University. Exhibit B, however, has not been authenticated and is thus inadmissible; therefore, it will be ignored by the court for purposes of the motion for summary judgment.

The plaintiff filed a second affidavit on June 13, 1997, in an attempt to authenticate Exhibit B and other unauthenticated evidentiary submissions. According to Exhibit D, the court's summary judgment scheduling order, attached to and made part of the court's December 18, 1996, scheduling order, the plaintiff's deadline for submitting evidentiary materials was May 5, 1997. The court extended the plaintiff's deadline until May 20, 1997, in an order entered on April 29, 1997. Therefore, her attempt to submit additional evidentiary materials out of time on June 13, 1997, fails. She only succeeded in creating additional expense to herself, to the defendants, and to the American taxpayers.

[9] The defendants dispute this fact, citing Defendants' Exhibit B at 7-8 as support for the dispute. The plaintiff's affidavit establishes this fact, and Defendants' Exhibit B does not refute it. Therefore, the court will consider this fact as undisputed for purposes of the motion for summary judgement.

that period of time based upon previous meritorious awards given by Dr. Montgomery for similar circumstances.

Bailey terminated her employment with the University in June 1995. Mary Morris-Billings was hired as Director of Counseling in February 1996 and presently serves in that capacity. In October 1996, Montgomery was succeeded as Vice President for Student Affairs by Dr. Dorothy Houston.

The plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 8, 1995, alleging sex discrimination on the part of the University. Since the time she filed the grievance and the EEOC charges, she has, among other things, received reprimands, been suspended, and had annual leave requests denied after she gave the appropriate notice. Williams filed this action on September 10, 1996.

## III.   Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of

13

material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to

14

determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

15

## IV.  Discussion.

### A.  Equal Pay Act Claim.

The plaintiff contends that the University knowingly and intentionally violated the Equal Pay Act by failing to pay her a salary substantially equal to that paid to similarly situated male employees. *Complaint* at 5-6.[10]  The EPA prohibits sex discrimination as manifested by the wages an employee is paid. The plaintiff bears the initial burden of proving "that [her] employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206 (d)); *see also, Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 590 (11th Cir. 1994). Assuming that Williams can make her initial showing, the burden then shifts to the University to prove by a preponderance of the evidence that the pay differential is justified. *Mulhall*, 19 F.3d at 590. A pay differential may be justified if it exists "pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1); *see also, Mulhall*, 19 F.3d at 590. Sex cannot provide any basis whatsoever for the wage differential. *Mulhall*, 19 F.3d at 590. If the University meets its burden, it has proven an affirmative defense and "is absolved of liability as a matter of law." *Id.* at 590-91.

---

[10] The court, in its memorandum of opinion entered on November 14, 1996, determined that Montgomery and Morris-Billings are not employers within the meaning of the EPA. *November 14, 1996, Memorandum of Opinion* at 14. Thus, the plaintiff now asserts this claim against only the University.

16

In EPA cases, the court must compare the jobs and not the individual employees

holding those jobs. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th

Cir. 1992).

> Only the "skills and qualifications actually needed to perform the jobs are
> considered." Comparators' prior experience is not relevant to the
> "substantially similar" inquiry. The examination also rests on primary, as
> opposed to incidental or insubstantial job duties. Job titles are a factor for
> consideration, but are not dispositive. The plaintiff need not prove that her
> job and those of the comparators are identical; the test is one of
> substantiality, not entirety. Nonetheless, in EPA cases "[t]he standard for
> determining whether jobs are equal in terms of skill, effort, and responsibility
> is high."

*Mulhall*, 19 F.3d at 592 (internal citations omitted). Williams has identified four male

employees of the University whom she contends are comparators — Jimmy Downing,

James Garner, William Thigpen, and Michael Radden.

## 1.   Comparison to Jimmy Downing.

### a.   Prima Facie Case.

The plaintiff alleges that she and Downing performed substantially similar job duties

and yet she was consistently paid approximately $5,000 less per year than Downing.

*Opponent's Responsive Submission* at 2-4. The undisputed facts demonstrate that

Downing was first hired by the University in July 1981. He transferred to the personal-social

counselor position in February 1988, in which he earned an initial salary of $24,000. Later

that year, the University instituted a salary schedule for staff employees, pursuant to which,

Downing's position was classified as a grade XV. Due to his length of service, he was

assigned to step 5 within that grade, and his salary thus rose in January 1989 to $25,440.

The University subsequently determined that, due to Downing's length of service with the

University, he should have been classified instead as a grade XV, step 9; therefore, in October 1989, he was reclassified, and his salary was raised to $27,040. Since that time and up until his resignation in 1996, he received salary increases only as a result of salary schedule adjustments or cost of living increases that all other University employees also received.

The plaintiff was first hired by the University as an hourly employee in October 1990 and transferred to the position of personal-social counselor in January 1991. She was classified as a grade XV, step 1, and her initial annual salary was $22,644. Her duties were exactly the same as Downing's with the exception of Downing's veteran affairs responsibilities. In August 1991, the University redefined Williams' and Downing's job duties and delineated specific areas of responsibility for each individual. Williams' job title became Coordinator, Counseling and Student Development, while Downing's became Coordinator, Student Development Programs. Williams admits that the two new positions were assigned different areas of responsibility and function with the only overlapping duty being the responsibility for counseling students. Neither individual received a salary adjustment at that time. The plaintiff assumed responsibility for the University's Access to Learning Program in 1993 and received a $5,000 annual increase in salary at that time. When Downing left the University in 1996, he was earning a salary of $30,733, while Williams' salary was $29,748. If one were to subtract the $5,000 she was paid to assume additional responsibilities, her salary would be $24,748.

The undisputed facts demonstrate that the plaintiff could potentially establish a prima facie case of an EPA violation on the part of the University. Williams' and Downing's

18

duties as personal-social counselors were almost entirely the same, and a question exists for a jury to determine whether, after August 1991 when the University assigned the individuals different areas of responsibility and function, they were nevertheless performing jobs requiring equal skill, effort, and responsibility under similar conditions.

## b. Affirmative Defense.

The burden thus shifts to the University to prove by a preponderance of the evidence that the disparity between Downing's and Williams' wages was justified by falling within one of the four exceptions established in the EPA. The undisputed facts indicate that Downing was hired as an employee of the University almost ten years before the plaintiff. It is also undisputed that the University utilizes a salary schedule pursuant to which jobs are given a grade and individuals are assigned to a step within that grade based upon their length of service as employees. Downing was first assigned to step 5 within grade XV based upon his length of service. He was later reassigned to step 9, but the defendants have not offered a reason for such action. They merely state that it was determined he was previously misclassified. The plaintiff was assigned to step 1. The University has failed to prove by a preponderance of the evidence that gender played no role in Downing's reassignment from step 5 to step 9, nor have they specifically proven how the salary schedule operates. For these reasons, the court will allow the plaintiff's EPA claim based on a comparison to Jimmy Downing go forward.

19

### 2.   **Comparison to James Garner.**

#### a.   **Prima Facie Case.**

The plaintiff contends that James Garner received a merit increase for assuming additional duties but disputes that Garner actually assumed those duties. She further asserts that while she and Garner are similarly situated, only he received compensation for increased responsibility. *Opponent's Responsive Submission* at 5.

At the time Williams was first employed, Garner was serving as Director of Housing. The undisputed facts establish that Garner has been employed with the University since 1968. As Director of Housing, he was responsible for all aspects of University housing, including the oversight and assignment of students to the dormitories, hiring and supervision of dorm staff, building repair and maintenance, all student disciplinary matters, as well as numerous duties. While serving in that capacity, he received the $3,000 one time merit award to which the plaintiff refers for assuming the majority of the duties of two individuals who left the employ of the University and were not replaced. He did not receive an increase in his salary of $34,272. The plaintiff in her responsive submission disputes whether Garner in fact assumed those extra duties but offers no evidence to support her contention. Even if Garner did not actually take on the additional responsibilities, however, as a matter of law, his role as Director of Housing did not have the same level of responsibility as the personal-social counselor position. The plaintiff thus has not established a prima facie case of EPA violation with regard to Garner for the period of time in which she held the position of personal-social counselor. She has made out a prima facie case, however, with regard to Garner for the period of time in which she has held the

20

position of Coordinator, Counseling and Student Development. The facts are unclear as to the plaintiff's exact responsibilities in that role; thus, the court must assume that she can meet her burden.

### b.   **Affirmative Defense.**

The burden therefore shifts to the University to offer an affirmative defense. Like Downing, Garner has been employed with the University much longer than the plaintiff — in this case, for approximately 22 years longer. Again, however, the University's failure to provide the court with specific evidence regarding the salary schedule and how it operates proves fatal to its motion for summary judgment in this instance. While it appears to the court that the defendant quite likely was justified in paying Garner more than it did the plaintiff, the University has not proven such a matter by a preponderance of the evidence. Accordingly, the plaintiff will be allowed to proffer Garner as a comparator for the period of time in which she served as Coordinator, Counseling and Student Development.

### 3.   **Comparison with William Thigpen.**

#### a.   **Prima Facie Case.**

The plaintiff contends that William Thigpen received an increase in salary from $15,882 to $27,336 when he was appointed Interim Director of Housing while she received no similar compensation for taking on additional responsibilities. *Opponent's Responsive Submission* at 5. Thigpen joined the University staff in 1984 and currently earns wages of $36,022.23 annually. As Interim Director of Housing, he is responsible for the housing of approximately 3,000 students in the University's dormitories and living/learning centers. As was the case with Garner while he was Director of Housing, Williams cannot establish

21

a prima facie case with regard to Thigpen for the period of time in which she served as personal-social counselor. The two individuals' duties are simply too dissimilar to be considered to require equal skills, efforts, and responsibilities. For reasons set out above, however, she can compare herself to Thigpen for the period of time in which she has held the Coordinator, Counseling and Student Development title, for she has established the requisite prima facie case.

### b.   Affirmative Defense.

For the same reasons the University failed to prove an affirmative defense with regard to Garner, it also has not proven by a preponderance of the evidence that the wage differential between Thigpen and Williams is justified. Thus, the plaintiff will be allowed to compare herself to Thigpen for the period of time in which she has been Coordinator, Counseling and Student Development.

### 4.   Comparison to Michael Radden.

#### a.   Prima Facie Case.

Finally, the plaintiff compares herself to Michael Radden for purposes of her EPA claim. *Opponent's Responsive Submission* at 4. Radden became employed by the University on August 1, 1996, as Coordinator, Student Development Program. His initial salary was $25,226, and after receiving the three percent cost of living adjustment approved for all employees during the 1996-97 fiscal year, he presently earns $25,982 annually. Williams attempts to bifurcate her salary, claiming her actual salary is $25,640 and that the $5,000 she receives for her role with regard to the Access to Learning Program is a "pay supplement." *Id.*; *see also, Plaintiff's Exhibit A* at ¶ 12. In her response to the defendants'

proposed statement of undisputed facts, however, she admits that her current salary is $30,640. *Id.* at viii. The defendants support their assertion with evidence as well. *See Defendant's Exhibit B* at ¶ 12. The court is therefore unable to determine whether the additional $5,000 per year the plaintiff now receives is technically salary or a supplement. Regardless of how the money is characterized, however, it is compensation to Williams. As such, she cannot establish prima facie case of EPA violation with regard to this comparator, for she earns more than Radden.

## B.    Title VII Claim.

The plaintiff contends that the University discriminated against her on the basis of gender, *Complaint* at 6, when it "knowingly and intentionally failed to pay [her] a salary substantially equal to similarly situated male employees . . . ." *Defendants' Exhibit G* at 13-14. A plaintiff who alleges disparate treatment based upon gender under Title VII must prove that the defendant acted with discriminatory purpose. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984) (race case). The plaintiff can create a rebuttable presumption of discriminatory intent by establishing a prima facie case. *Young v. General Foods Corp.*, 840 F.2d 825, 828 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989). This may be done in three ways: (1) "by presenting direct evidence of discriminatory intent; [(2)] by meeting the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973); or [(3)] by demonstrating through statistics a pattern of discrimination." *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).

23

### 1.    **Direct Evidence and Statistical Evidence.**

"Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989) (citations omitted). "[O]nly the most blatant remarks, whose intent could be nothing more than to discriminate . . . constitute direct evidence of discrimination." *Id.* at 582 (footnote omitted). A second means by which Williams may establish a prima facie case is by presenting statistical evidence that demonstrates a pattern and practice of gender discrimination on the part of the University. *See Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (age discrimination case). She has presented no direct evidence or statistical data; therefore, she must attempt to establish a prima facie case of discrimination through circumstantial evidence.

### 2.    *McDonnell Douglas Test.*

Where a plaintiff's discrimination claim is based on circumstantial evidence, the court employs the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff has the burden of establishing a prima facie case of discrimination.[11] "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden of production then shifts to the defendant, requiring an articulation of some "legitimate, nondiscriminatory

---

[11] Under this test, the elements of a prima facie case may be modified to fit the circumstances. "The *McDonnell Douglas-Burdine* proof structure 'was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987) (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)).

24

reason" for the alleged discriminatory employment action. *Id.* "'[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted.'" *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 950 (11th Cir. 1991), *cert. denied*, 502 U.S. 1058 (1992) (quoting *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination "drops from the case." *Burdine*, 450 U.S. at 255 & n.10. The plaintiff must then demonstrate by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather is a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. "'[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significantly probative' evidence on the issue to avoid summary judgment.'" *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996) (quoting *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989)) (other citations omitted) (alterations in original). The plaintiff may establish that the defendant intentionally discriminated against him "'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989) (quoting *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1445 (11th Cir.), *cert. denied*, 474 U.S. 1005 (1985)). "'Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate,

non-discriminatory reasons for its actions.'" *Isenbergh*, 97 F.3d at 444 (quoting *Young*, 840 F.2d at 830). If a plaintiff succeeds in this burden, the "disbelief of the defendant's proffered reasons, together with the prima facie case, is sufficient circumstantial evidence to support a finding of discrimination" and to preclude summary judgment. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir.).

To make out a prima facie case under the instant circumstances, Williams must demonstrate that "(1) she is a member of a protected class, (2) was similarly situated with a person outside of the protected class, but (3) was denied a condition of employment afforded that person." *Thompkins v. Morris Brown College*, 752 F.2d 558, 562 n. 7 (11th Cir. 1985). For reasons set out in the above discussion of Williams' EPA claim, the facts regarding the plaintiff's job duties as Coordinator, Counseling and Student Development and as Counselor/Coordinator, Access to Learning are in dispute sufficient to allow the plaintiff to establish a prima facie case of Title VII discrimination.

The burden thus shifts to the University to articulate a legitimate, nondiscriminatory reason for paying the plaintiff less than it payed her comparators. This it has done, for the undisputed facts demonstrate that the University instituted a salary schedule in 1988, pursuant to which all staff positions were classified with a grade, and each person was placed on a step within that grade based upon their length of service as an employee. Sex, race, age, or any other such factor did not play a role in the classification. The personal-social counselor position was assigned a grade XV, as were the positions Williams and Downing subsequently occupied after August 1991. Based upon Downing's and Williams'

26

lengths of service with the University, Downing was assigned to step 9, while the plaintiff was assigned to step 1.

The burden thus returns to the plaintiff to demonstrate by a preponderance of the evidence that the University's proffered reason is a mere pretext and that, in fact, the pay disparity was motivated by discriminatory intent. The plaintiff cannot meet this burden, for she has offered no evidence that gender played any role in the University's actions. Accordingly, the Title VII claim will be dismissed.[12]

## C.   **Procedural Due Process Claims.**

The plaintiff contends that Morris-Billings and Montgomery, while acting under color of state law, violated the Fourteenth Amendment to the United States Constitution and the Alabama Constitution of 1901 by depriving her of property and liberty without due process of law.  Specifically, she asserts that the individual defendants failed to follow their own established procedures when filling the vacancy for Director of Counseling.  *Complaint* at 4-5.[13]

To state a claim pursuant to Section 1983, Williams must demonstrate that a person has acted "under color of any statute, ordinance, regulation, custom, or usage of any State" to deprive her of any "rights, privileges, or immunities secured by the Constitution and

---

[12] The plaintiff's Title VII claim and her EPA claim are based upon the same facts and allegations.  The EPA claim survives summary judgment while the Title VII claim does not, however, because the defendant's burden with regard to the EPA claim is heavy -- it must prove by a preponderance of the evidence that it has an affirmative defense.  Its burden under the *McDonnell Douglas* analysis, on the other hand, is extremely light in that it must merely articulate a legitimate, nondiscriminatory reason for its actions.

[13] Pursuant to the court's November 14, 1996, order, the Section 1983 claim remains viable only to the extent that the plaintiff seeks injunctive relief against Montgomery and Morris-Billings in their official capacities.  The Alabama Constitution claim remains viable only to the extent that Williams seeks injunctive relief against the individual defendants in both their official and individual capacities.  *November 14, 1996, Order* at 1-2.

27

laws." 42 U.S.C. § 1983. A violation of procedural due process does not occur "unless and until the State fails to provide due process." *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994), *cert. denied sub nom, McKinney v. Osceola County Bd. of County Comm'rs*, ___ U.S. ___, 115 S. Ct. 898 (1995). To determine whether there has been a breach of procedural due process rights pursuant to federal or state law, the court must consider whether the plaintiff has been deprived of a protected interest in life, liberty, or property, and if so, what process is due her. *E.g., id.* at 1557. The court determined when ruling on the motion to dismiss that Williams' complaint asserted no liberty interest and that the only potential property interest she may have would lie in the Handbook's promotion procedures. *November 14, 1996, Memorandum of Opinion* at 4-10.

At the summary judgment stage, however, it is not sufficient that the plaintiff has a potential property interest. Instead, she must reasonably demonstrate that in fact she has such an interest. Property interests may arise from "state statutes, local ordinances, contracts, rules and regulations, and mutually explicit understandings." *Bishop v. Wood*, 426 U.S. 341, 345 (1976). Under Alabama law, an employee's property interest in his or her job may be established by the employee handbook. *See Davis v. University of Montevallo*, 638 So. 2d 754, 756-57 (Ala. 1994). In this case, however, Williams asserts a property interest in the Handbook's promotion procedures yet has presented to the court no case law representing that, pursuant to Alabama law, an employee may have such a property interest. The undisputed facts demonstrate that the University's Handbook explicitly states that it "provide[s] faculty and administrative staff with pertinent information and guidance relative to the University, its mission, goals, organization, policies and operational

28

procedures." *Defendants' Exhibit B-1* at 1. The Handbook "is not intended to constitute or be part of an employment contract between the employee and the University, *nor is anything contained in [it] a covenant and should not be construed as such.*" *Id.* (emphasis added). Accordingly, even viewing the facts in a light most favorable to the plaintiff, Williams has shown no property interest. The individual defendants thus could not have violated her procedural due process rights pursuant to the United States or the Alabama Constitutions. These claims therefore will be dismissed.

## D.    Substantive Due Process Claims.

Williams asserts in her complaint that Montgomery and Morris-Billings, while acting under color of state law, deprived her of property and liberty without due process of law in violation of the Fourteenth Amendment and Alabama Constitution. *Complaint* at 5. Specifically, she contends that the individual defendants failed to pay her equivalent wages to those paid to male counterparts, subjected her to unreasonable job discrimination, deviated from reasonable and routine practices, and retaliated against her for filing her grievance.[14] *Id.* at 5-6. The court, when ruling on the motion to dismiss, dismissed these claims to the extent the plaintiff based them upon employment law. *November 14, 1996, Memorandum of Opinion* at 11. Therefore, the court must now determine whether Williams states a viable claim based upon the right to speak freely.[15]

---

[14] The plaintiff does not make, however, a Title VII retaliation claim.

[15] The court's previous order leaves as the only viable Section 1983 claim the plaintiff's claim seeking injunctive relief against Montgomery and Morris-Billings in their official capacities. The Alabama Constitution claim remains to the extent Williams seeks injunctive relief against the individual defendants in both their official and individual capacities. *November 14, 1996, Order* at 2-3.

29

"A public employer may not take adverse employment action against a public employee in retaliation for engaging in protected speech." *Williams v. Alabama State Univ.*, 865 F. Supp. 789, 796-97 (M.D. Ala. 1994) (citing *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989)). However, for the plaintiff to prevail on such a free speech claim as a public employee, she must prove that her speech was protected -- that is, it can be fairly characterized as constituting speech on a matter of public concern. *See Connick v. Myers*, 461 U.S. 138, 146-47 (1983). A matter of public concern is that which "relate[s] to a matter of political, social, or other concern to the community." *Id.* at 146. The court must determine whether Williams "spoke on behalf of the public as a citizen, or whether [she] spoke for herself as an employee." *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 146-47.

Williams' grievance, filed on September 13, 1994, charges Montgomery with committing three violations: (1) violation of the Handbook's procedures with regard to filling the vacant Director of Counseling and Development position; (2) exhibiting unethical and unfair treatment towards her as a candidate for that position; and (3) sexually discriminating against her based on salary. *Defendants' Exhibit B-2* at 1. She stated in the grievance that as redress, she sought appointment as Director of Counseling and compensation for assuming this job's tasks and responsibilities on an interim basis. *Id.* at 12. Williams' speech focused largely on how Montgomery acted toward her and how his conduct affected her position and salary at the University. She has presented no evidence

30

that she relayed her concerns regarding her treatment to the public or attempted to involve the public in any manner. The redress she sought demonstrates that her speech was motivated entirely by her own self-interest in improving the conditions of her employment. Thus, as an employee grievance, the plaintiff's speech was not a matter of public concern. Because she cannot demonstrate this threshold showing, her claims pursuant to both the Fourteenth Amendment and the Alabama Constitution will be dismissed.

**V.    Conclusion.**

The plaintiff's claim pursuant to the Equal Pay Act survives the motion for summary judgment. All of her other claims, however, will be dismissed with prejudice. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this __27th__ of June, 1997.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE